United States Court of Appeals
Fifth Circuit

**F I L E D**

September 11, 2007

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

)))))))))))))))))))))))))))

No. 06-60801

)))))))))))))))))))))))))))

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

HERIBERTO RODRIGUEZ-FLORES,

Defendant-Appellant.

---

Appeal from the United States District Court
for the Southern District of Mississippi
No. 2:05-CR-00021-KS-JMR

---

Before DENNIS, CLEMENT and PRADO, Circuit Judges.

Per Curiam:[*]

Heriberto Rodriguez-Flores ("Flores") was convicted of possession with intent to distribute more than fifteen kilograms of methamphetamine, in violation of 21 U.S.C. § 841(a)(1). Flores argues that the district court erred by denying his motion to suppress evidence discovered during a roadside search of his vehicle. For the reasons that follow, we affirm the judgment of

---

[*]Pursuant to 5TH CIRCUIT RULE 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIRCUIT RULE 47.5.4.

1

the district court.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On the night of June 27, 2005, Officer Stan Livingston ("Livingston") of the Laurel Police Department was positioned on the side of Interstate 59 operating a stationary radar. Shortly before 10:30 p.m., Livingston observed a white Pontiac traveling north in excess of the speed limit. At 10:28 p.m., Livingston pulled over the vehicle, of which Flores was the driver and only occupant. Livingston approached the passenger side of the vehicle, informed Flores that he had been speeding, and requested his driver's license. Flores produced a Florida driver's license. Livingston asked Flores about his itinerary, and Flores responded that he was coming from Tampa, Florida, and was traveling to Atlanta, Georgia. Livingston testified that this response made him suspicious, as Interstate 59 in Mississippi was hardly the most direct route between Tampa, Florida, and Atlanta, Georgia.

Livingston asked Flores to exit and walk to the rear of the vehicle. Livingston patted Flores down and again queried him about his itinerary. Flores then responded that he was coming from Guadelajara, Mexico, and going to Atlanta, Georgia. Flores stated that he had crossed the border that morning. Livingston also asked Flores if he had ever been arrested, and Flores stated that he had not. Livingston testified that Flores was responsive to his questions and was able to communicate in English.

2

Livingston then returned to his patrol car to check Flores's information through the Blue Lightning Operations Center (BLOC). BLOC is a system by which police can obtain information about outstanding warrants, criminal history, and also recent border crossings. The BLOC search, which took about six minutes to perform, did not turn up any outstanding warrants for Flores. It did reveal that Flores had prior arrests for driving while intoxicated and either assault or shoplifting, and also that Flores had actually crossed the Mexican border late at night on the prior day.

Livingston then resumed questioning Flores. He asked where Flores went after crossing the border, and Flores stated that he had visited his brother in Texas. Livingston also inquired again whether Flores had been arrested, and Flores again said he had not. Livingston then specifically asked if Flores had been arrested for driving under the influence, and Flores admitted that arrest. Livingston then asked, in succession, whether Flores had any marijuana, cocaine, heroin, or methamphetamine. Flores responded no and shook his head to each question, except that when asked about methamphetamine he only laughed. Livingston testified that this behavior increased his suspicion. Livingston asked Flores whether he objected to Livingston searching the vehicle, and Flores responded "no" and "check it." Livingston then retrieved his drug-detecting dog from the patrol car and ran

3

the dog around the vehicle. Livingston testified that his dog alerted to the vehicle. Livingston again asked Flores whether there were drugs in the vehicle, and Flores again said no. Livingston then called his partner for backup.

Livingston began to inspect the vehicle. Shining his flashlight in from the passenger side door, Livingston noticed that the bolts holding the back seat had been "tooled numerous times." When Livingston's partner arrived, the two began a systematic search of the vehicle. After about ten minutes, the officers began to focus on the cargo area of the vehicle, where at approximately 10:55 p.m. they discovered hidden compartments on the left and right sides near the spare tire. The compartments were covered by a panel that was riveted closed, sealed with silicone and coated with adhesive and fresh paint. It took the officers about fifteen to eighteen minutes to open the compartments, inside of which they discovered numerous packages. At this point, the officers placed Flores in handcuffs and advised him of his Miranda rights. The officers contacted the narcotics department. When the narcotics investigators arrived, they transported Flores's vehicle to a station where the packages were removed. The officers found thirty-nine packages containing 68.75 pounds of a substance containing methamphetamine.

In a July 13, 2005 indictment, Flores was charged with possession with intent to distribute more than fifteen grams of a substance containing methamphetamine, in violation of 21 U.S.C.

4

§ 841(a)(1). Flores filed a motion to suppress the drugs found in his vehicle during the June 27, 2005 traffic stop. Flores argued that his detention was unlawfully prolonged in violation of the Fourth Amendment and that he did not give voluntary consent to the search of his vehicle. The district court denied Flores's motion from the bench, and an order reflecting that denial was entered on February 24, 2006. Flores then pled guilty to count one of the indictment, reserving his right to appeal the district court's denial of his motion to suppress. Flores was sentenced to 324 months imprisonment. Flores timely filed a notice of appeal.

## II. JURISDICTION AND STANDARD OF REVIEW

This is an appeal from a final judgment of a United States district court in a criminal case. Accordingly, this court has jurisdiction under 28 U.S.C. § 1291.

When considering a ruling on a motion to suppress evidence, we review questions of law de novo and findings of fact for clear error. United States v. Castro, 166 F.3d 728, 731 (5th Cir. 1999) (en banc). We view the evidence in the light most favorable to the party that prevailed in the district court--in this case, the government. Id.

## III. DISCUSSION

Flores makes three arguments on appeal. Flores contends that his traffic stop was unlawfully extended in the absence of reasonable suspicion. He further claims that his consent to

5

Livingston's request to search his vehicle was involuntary. Flores also maintains that the search of his vehicle was unsupported by probable cause.

**A.** **Flores's continued detention was based on reasonable suspicion**

The stopping of a vehicle and detention of its occupants constitutes a "seizure" under the Fourth Amendment. United States v. Brigham, 382 F.3d 500, 506 (5th Cir. 2004) (en banc). This court examines the reasonableness of a traffic stop under the standard for investigative detention announced in Terry v. Ohio, 392 U.S. 1 (1968). United States v. Sanchez-Pena, 336 F.3d 431, 436-37 (5th Cir. 2003). Terry held that "limited searches and seizures are not unreasonable when there is a reasonable and articulable suspicion that a person has committed a crime." United States v. Santiago, 310 F.3d 336, 340 (5th Cir. 2002). Pursuant to Terry, we examine (1) whether the officer's action was justified at its inception, and (2) whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop. Terry, 392 U.S. at 19–20; Brigham, 382 F.3d at 506.

This court has held that requesting a driver's license, insurance papers, and vehicle registration and running computer checks thereon are permissible actions reasonably related in scope to a valid traffic stop for speeding. United States v. Shabazz, 993 F.2d 431, 437 (5th Cir. 1993). This court has also

6

held that, while they await the result of the computer check, the police may question the vehicle occupants, even about subjects unrelated to the reasons for the stop.  Id. at 436 (noting that "detention, not questioning, is the evil at which Terry's second prong is aimed"). We have further held that the police may question the occupants before performing the computer check, so long as the questioning is related to the reasons for the stop, or to reasonable suspicions that subsequently arose. Brigham, 382 F.3d at 510-11 (noting that "[c]omputerized license and registration checks are an efficient means to investigate the status of the driver and his auto, but they need not be pursued to the exclusion of, or in particular sequence with, other efficient means"). We have repeatedly held, however, that "[i]f all computer checks come back clean, then as a general matter reasonable suspicion disappears, and there is no legitimate reason for extending the stop." United States v. Jenson, 462 F.3d 399, 404 (5th Cir. 2006); see also Santiago, 310 F.3d at 341-42 (noting that "[o]nce the computer check is completed and the officer either issues a citation or determines that no citation should be issued, the detention should end and the driver should be free to leave"); United States v. Jones, 234 F.3d 234, 241 (5th Cir. 2000); United States v. Dortch, 199 F.3d 193, 198 (5th Cir. 1999).

If, however, "additional reasonable suspicion arises in the

course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed." United States v. Lopez-Moreno, 420 F.3d 420, 431 (5th Cir. 2005). Thus, under our caselaw, if the computer checks come back clean, the officer must issue the citation, if a citation is being issued, and then must immediately cease to detain the driver, unless additional reasonable suspicion has arisen before or during the period of the computer check. See Dortch, 199 F.3d at 200.

On appeal, Flores does not challenge the lawfulness of the initial stop for speeding, but instead the legality of his extended detention by Livingston. Moreover, it is clear under our precedent that Livingston was entitled to run the computer checks on Flores and, beforehand, to query him about his itinerary and record. See Brigham, 382 F.3d at 510-11. The question therefore narrows to whether Livingston's detention of Flores after the completion of the computer checks was justified by reasonable suspicion.

"Reasonable suspicion exists when the detaining officer can point to specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the search and seizure." United States v. Estrada, 459 F.3d 627, 631 (5th Cir. 2006); see also United States v. Ibarra-Sanchez, 199 F.3d 753, 758 (5th Cir. 1999) ("Officers must base their

8

reasonable suspicion on 'specific and articulable facts,' not merely 'inarticulate hunches' of wrongdoing."). Our determination of whether reasonable suspicion existed must be based on the totality of the circumstances and the collective knowledge and experience of the officer or officers. Estrada, 459 F.3d at 631-32.

Flores argues that at the time the computer checks were completed, Livingston had not developed a reasonable suspicion to justify Flores's continued detention. Flores's contention is without merit. At the time that the computer checks on Flores were completed, Livingston was aware that (1) Flores initially told an implausible story of his itinerary, and subsequently changed his story; (2) Flores had lied about his arrest record; (3) Flores had lied about his time of entry into the United States; and (4) Flores had recently crossed the border from Mexico, a common origin of illicit drugs. These circumstances are sufficient to create reasonable suspicion of drug trafficking.

The cases cited by Flores in which this court has held that reasonable suspicion did not exist--Dortch, Jones, Santiago, and Jenson--are distinguishable. In each of these cases, the government argued that allegedly inconsistent statements of the driver and passenger created reasonable suspicion. In Jones and Jenson, however, this court questioned whether the answers were genuinely inconsistent. In Jones, the court explained:

9

> As for the allegedly inconsistent statements about Daniel's job, they do not amount to reasonable suspicion about drug trafficking. Daniel stated that he did some promotional work and managing. But when asked about Daniel's work with the record company, Jones replied that Daniel only did promotional work and no managing. Nonetheless, whether Jones said that Daniel did not manage is immaterial and does not raise any suspicions. Jones's statement merely shows that he does not know everything about Daniel's work other than promoting.

234 F.3d at 242. The court also noted that there was no real inconsistency between the names given by the two men of their place of employment. Id. at 241.

In Jenson, the government pointed to inconsistent answers between Jenson, the driver, and Cotton, a passenger. The government put on evidence that:

> Gray [the police officer] again asked Jenson where he worked, and he replied "Tommie and Cotton," or "Tommie-Cotton," presumably referring to his construction business with his uncle. Gray then asked Cotton where he worked, and he replied that he was self-employed and that his business did not have a name. Gray found the discrepancy between the two answers suspicious.

462 F.3d at 403. This court concluded that it could not take this exchange into consideration, because this conversation occurred after the initial purpose of the traffic stop had been fulfilled. Id. at 404. The court went on to note, however, that the answers of the two men were not actually suspicious. The court stated:

> When asked about his employment, Jenson replied that he worked for his uncle in construction and that the name of the business was "Tommie-Cotton" or "Tommie and Cotton," presumably combining his and his uncle's names. Cotton, in turn, answered that he was "self-employed," which is not by itself inconsistent with having a nephew as an employee. He also stated that his business did not have a

10

name, but Jenson may have merely given a descriptive title for the two-man operation, instead of a formal name, when pressed.

Id. The not-very-inconsistent inconsistencies in Jones and Jenson can be contrasted with the outright lies told by Flores on three subjects--his itinerary, his arrest record, and his border-crossing time.

In Dortch and Santiago, the inconsistencies were not so easily explained. In Dortch, the government presented evidence that:

Dortch and the passenger gave inconsistent answers about Dortch's relationship to the person who had rented the car, and although Dortch stated that they had been in Houston for the last two days, the rental car papers showed that the car had been rented the day before in Pensacola, Florida, where Dortch lived, and he stated that they were not carrying any luggage.

199 F.3d at 196. The court concluded, however, that assuming these answers were indeed suspicious, they did not give rise to a reasonable suspicion of drug trafficking. Id. at 199.[1]

In Santiago, the government pointed to evidence that Santiago informed the police officer that he was traveling to Atlanta for a one-week vacation, whereas his passenger told the officer that they would be staying in Atlanta for two to three weeks. 310 F.3d at 338. This discrepancy is not especially suspicious, but Santiago also first stated that his passenger was

---

[1] The court instead concluded that the answers gave rise to a reasonable suspicion that the car was stolen, a suspicion that was dispelled when the computer checks came back clean. Id.

11

his wife, and then stated that a different woman was his wife and that his passenger was his ex-wife. Id. at 338-39. This court determined, however, that "there was no reasonable or articulable suspicion that Santiago was trafficking in drugs." Id. at 342.

In the instant case, there is additional evidence linking Flores with drug trafficking. In Estrada, this court noted that "the fact that the vehicle had recently crossed from Mexico, a common origin of illicit drugs," was an element contributing to the existence of reasonable suspicion. 459 F.3d at 632 (internal quotation marks removed). In this case, Flores had recently crossed the Mexican border and had lied about the time of his crossing. This information, in combination with Flores's lies about his itinerary and arrest record, was enough to create a reasonable suspicion of drug trafficking sufficient to justify Flores's continued detention for the few minutes that it took Livingston to question Flores about drugs and then bring his drug-detecting dog to sniff the vehicle.

**B.    Probable cause existed for the search of Flores's vehicle**

The district court concluded that Livingston's search of Flores's vehicle was lawful in light of Flores's voluntary consent to the search. Flores maintains that his consent was not voluntary, arguing that he did not feel free to leave at the time the consent was given and that he did not understand the officer's request because he does not speak English. We need not

decide this issue, however, because we hold that the drug-detecting dog's alert to Flores's vehicle created probable cause for the search.

It is well established that warrantless searches of automobiles are permitted by the Fourth Amendment if supported by probable cause. <u>United States v. Seals</u>, 987 F.2d 1102, 1107 (5th Cir. 1993) (citing <u>United States v. Ross</u>, 456 U.S. 798 (1982)). A positive alert by a drug-detecting dog creates probable cause for a search of the vehicle. <u>Sanchez-Pena</u>, 336 F.3d at 444; <u>United States v. Williams</u>, 69 F.3d 27, 28 (5th Cir. 1995); <u>United States v. Dovali-Avila</u>, 895 F.2d 206, 207 (5th Cir. 1990). Further, if the police have probable cause to believe that contraband is located somewhere in the vehicle but do not know exactly where, the police may search the entire vehicle. <u>Seals</u>, 987 F.2d at 1107 n.8 (citing <u>Ross</u>, 456 U.S. at 799).

The dog sniff is itself not a search within the meaning of the Fourth Amendment. <u>Seals</u>, 987 F.2d at 1106. Thus the sniff performed on Flores's vehicle while he was lawfully detained did not implicate the Fourth Amendment. <u>See</u> <u>Illinois v. Caballes</u> 543 U.S. 405, 409 (2005). Accordingly, it was lawful for Livingston to run his drug-detecting dog around Flores's vehicle. Once the dog alerted, Livingston had probable cause to search the vehicle in full. <u>See</u> <u>Seals</u>, 987 F.2d at 1107.

## IV. CONCLUSION

13

For the foregoing reasons, we hold that the district court did not err in denying Flores's motion to suppress. We AFFIRM the judgment of the district court.

AFFIRMED.